### 9532.   GILBERT *v.* COPELAND.

1. An executory agreement for the sale of goods to be actually delivered at a future day is valid, though at the time of making the contract the seller has not the goods in his possession, has not contracted to purchase them, and has no expectation of acquiring them otherwise than by producing, manufacturing, or purchasing them at some future time before the day of delivery. Civil Code (1910), § 3222 (7); *Forsyth Mfg. Co.* v. *Castlen*, 112 *Ga.* 199, 202 (37 S. E. 485, 81 Am. St. R. 28); *Columbus Crate Co.* v. *Evans*, 130 *Ga.* 432 (60 S. E. 1065).

2. In determining, however, whether a given contract be for the sale of goods, or whether it be for work and labor to be done, the test to

be applied is whether the primary purpose and intent of the agreement is merely to provide for the delivery of the articles contracted for, or whether the essential consideration is work and labor to be done at the instance of the employer and for his use and benefit; that is to say, is the labor of the producer to be expended for his employer, or for himself?

3. While possession of personal property is presumptive evidence of ownership, the presumption is not conclusive, and any person dealing with the possessor as the owner will not obtain title to the property as against the true owner, unless the latter has done something to mislead or deceive such purchaser. *Harris Loan Co.* v. *Elliott & Hatch Co.*, 110 *Ga.* 303 (3) (34 S. E. 1003).

4. If the contract here involved be construed as being one for the executory sale of merchandise, an action of trover would not lie against a third person purchasing from the vendor; but construing it, as it must be construed, as being merely a contract for work and labor to be performed, the proceeding in trover was not subject to general demurrer. *Cobb* v. *Johnson*, 126 *Ga.* 618 (55 S. E. 935).

DECIDED OCTOBER 22, 1918. REHEARING DENIED NOVEMBER 4, 1918.

Trover; from city court of Thomasville—Judge W. H. Hammond. January 3, 1918.

Gilbert sued Copeland in trover, alleging as follows:

"1. That on the 10th day of January, 1917, plaintiff entered into a contract with the said John Bell, a copy of which said contract is hereto attached, marked Exhibit A, wherein the said John Bell agreed to undertake to raise for and deliver to D. H. Gilbert all of the melon seed grown during the year 1917 on 10 acres of land, to be selected by said John Bell, suitable in quantity and condition for such crop.

"2. By the terms of said contract the said plaintiff was to loan, free of charge, for their use, suitable bags for delivering the crop, also to furnish the stock seed; and it was further agreed that the said sacks, stock seed, and the crop produced therefrom were to remain and be the property of the said plaintiff, except such seed as were found on delivery to be impure, through fault of the grower, or as in any other respect in the judgment of the said plaintiff unfor [unfit?] for seedman's use, and that could not be made fit without an unreasonable amount of recleaning or handpicking.

"3. In consideration of the faithful carrying out of the said provisions of the said contract on the part of the said John Bell, the plaintiff agreed to pay, for his services and labor in growing and delivering the said seed grown on the said land, at the rate

of 10¢ per pound for all the seed grown found to be fit and suitable for seedman's use.

"4. Plaintiff shows that he has performed his part of the contract in every detail by furnishing to the said John Bell the stock seed and by loaning to him the bags necessary for delivering the seed grown by said John Bell.

"5. That the said John Bell planted the stock seed furnished by plaintiff, on land selected, prepared, and cultivated by him during the year 1917, and produced 625 pounds of watermelon seed suitable to seedmen's use, described as follows: 625 pounds of watermelon seed in cotton, seamless bags, 8 of the bags branded with 'BBB,' and 3 branded with a single 'A,' the same being all the watermelon seed grown and gathered by John Bell during the year 1917.

"6. That the said John Bell, instead of delivering the said [seed?] to plaintiff in accordance with his contract, converted them to his own use by selling them to H. C. Copeland at 15¢ per pound, and fails and refuses to deliver them to the plaintiff in compliance with his contract.

"7. That the said seed are now in the possession of H. C. Copeland, the same being of the value of $325.00.

"8. That petitioner claims title to the said seed, and has made demand upon H. C. Copeland for the same, but he fails and refuses to deliver them to your petitioner, or to pay him the profits thereof."

The contract, a copy of which was attached to the petition, is as follows:

"Memorandum of agreement, made this 10th day of January, 1917, by which I, John Bell, of ————, agree to undertake to raise for and deliver to D. H. Gilbert, of Monticello, Florida, as hereinafter provided, the following named seeds on land suitable in quantity and condition for the purpose and located in the County of Jefferson, State of Florida, it being understood that the stock seed and the seed crop produced therefrom is, and is to remain, the property of D. H. Gilbert, except as hereinafter provided: Ten 10 acres Watson. And I hereby agree to properly prepare and plant said land with stock seed to be furnished for this purpose by D. H. Gilbert. I further agree to properly cultivate and care for the crop and harvest, cure, separate, and clean, as

well as practicable with ordinary farm machinery, its entire seed products in such manner as to secure the greatest possible returns of seed suitable for seedman's use, deliver all seed to D. H. Gilbert, at his warehouse in Monticello, Florida, as soon as it can be put in suitable condition, and before October 31, 1917, without reserving, wasting, selling, or allowing any portion of the crop to pass from my possession except as delivered to said D. H. Gilbert, as herein provided. I further agree that as far as I am able to prevent it, there shall be no other plants of the same species grown within one fourth of a mile of the above-described crop, and that, in growing, harvesting, storing, threshing, cleaning, and delivering said seeds, I will take reasonable precaution to secure their purity and prevent seed of any chance plants of a different variety or of a stock of the same variety different from that furnished by D. H. Gilbert becoming mixed with seeds grown under this agreement. It is further mutually agreed that D. H. Gilbert or his agent may at any time enter the field and at his own expense make such examinations, selections, or rejections as he deems desirable for the betterment of the crop for seed purposes; and he is not to pay for any necessary damage, if any, to the general crop, resulting from such work. It is further mutually agreed that upon the delivery of the crop, it is to be carefully weighted and tested. Any necessary re-milling to be done by D. H. Gilbert at his own expense. Payment is to be made only for such seed as he considers sufficiently clean, bright and vital for seedman's use, test to be not less than 80% germination, no credit being given for dirt, damaged, or poor seed, which has to be removed. In all cases all screenings and culls are to remain the property of the party who separates them from the crop. It is further mutually agreed that, if the crop as delivered is impure, through fault of the grower, or in any other respect is, in the judgment of said D. H. Gilbert, unfit for seedman's use, and cannot be made fit without an unreasonable amount of re-cleaning or handpicking, D. H. Gilbert may refuse to accept it in fulfilment of this contract. In this event it is agreed that the title to said crop shall vest in said John Bell.

"In consideration of the faithful carrying out of the provisions of this agreement on the part of the said John Bell, and for his services in the growing and delivering said seed, D. H. Gilbert

hereby agrees to pay him at the rate of ten cents per pound for all the seed satisfactory to said D. H. Gilbert which he may deliver in accordance with this agreement, in excess of the stock seed furnished him, said payment to be made immediately upon receipt of such seed and the ascertaining by D. H. Gilbert that it is vital and fit for seed purposes.

"John Bell  x  his mark.

"Witness.  Mable Yon."

The trial judge sustained a general demurrer of the defendant and dismissed the petition.

*Clifford E. Hay, Eldon L. Joiner,* for plaintiff.

*Titus, Dekle & Hopkins,* for defendant.

JENKINS, J. (After stating the foregoing facts.)  The question is, did Bell, under his contract with Gilbert, agree to sell his labor, or did the product of his labor constitute the subject-matter of the contract?  In other words, did Bell, under the terms of that writing, obligate himself to work as a laborer, in accordance with stipulated rules and restrictions, in the production for Gilbert, and under the latter's direction, of a certain commodity, at a wage to be determined by the amount of the output produced and delivered; or must the intent and purport of the writing be taken as constituting an executory contract for the sale of a commodity, whereby Bell obligated himself to produce for himself, and then to sell and deliver to Gilbert, a certain described product of his labor? It is plain that, by the explicit terms of the instrument itself, the first construction is declared to have been the intent of the parties to the agreement.  Must the law set up a contrary construction? In the contract Bell agrees "to raise for and deliver to D. H. Gilbert" the described seed; and it is further stated, as showing the intent of the parties, that "the stock seed and the seed crop produced therefrom is, and is to remain, the property of D. H. Gilbert."  Then follow certain stipulations of the contract, governing and restricting the grower of the seed in his work of production, with a provision added that "D. H. Gilbert or his agent may at any time enter the field and at his own expense make such examinations, selections, or rejections as he deems desirable for the betterment of the crop for seed purposes, and he is not to pay for any necessary damage, if any, to the general crop, resulting from such work."  The contract concludes as follows: "In consid-

eration of the faithful carrying out of the provisions of 'this agreement on the part of the said John Bell, and *for his services in the growing and delivering said seed* [italics ours], D. H. Gilbert hereby agrees to pay him at the rate of ten cents per pound for all the seed satisfactory to said D. H. Gilbert which he may deliver in accordance with this agreement, in excess of the stock seed furnished him, said payment to be made immediately upon the receipt of such seed and the ascertaining by D. H. Gilbert that it is vital and fit for seed purposes." The contract as made between Gilbert and Bell being in writing, no question arises as to the application of the statute of frauds; but we think an answer to the question which is in fact involved can be arrived at by determining whether, if this contract *had not* been in writing, Bell, upon himself complying with its terms, could have enforced fulfillment on the part of Gilbert.

In the case of *Cason* v. *Cheely,* 6 *Ga.* 554, Judge Nisbet, speaking for the court, said: "If the contract is for the sale of goods, it is within the statute, and if for work and labor done, it is not. The real difficulty is to fix a rule by which it may be determined what contracts are for the sale of goods, and what for work and labor done. There are two classes of cases which are easily determinable. Where the article exists at the time in solido and is capable of immediate delivery (as cotton in bags), the contract is clearly within the statute, as in Cooper v. Elston [7 T. R. 14]. All contracts for the sale of goods existing at the time in solido and capable of immediate delivery constitute a class about which there can be no difficulty—they are within the statute, without a case to the contrary. The other class of contracts which are equally free from difficulty are like that in Towers v. Osborne [1 Strange, 506], where an agreement is made for goods not in esse, and, therefore, incapable of immediate delivery, but, by the agreement, to be made by the work and labor and with the material of the vendor, and which when made may be reasonably presumed to be unsuited to the general market,—such as contracts for the manufacture of goods suited alone to a particular market, or for the painting of one's own portrait. In the former class the contracts are for the sale of goods upon which no work or labor is to be bestowed. In the latter class the work and labor and material constitute the prime consideration. They are for work and labor,

and are, by authority and upon principle, without the influence of the statute. Ex equo et bono, a man who agrees to bestow his labor in the manufacture of goods for a price, and which price he must lose unless the goods are received by him who ordered them, ought to be paid; and a statute which would protect the purchaser from liability in such a case would be alike impolitic and unjust. The cases which are difficult of determination are those which partake in some degree of both the classes referred to, yet fall decidedly within neither." In that opinion (p. 561) the following rule is adopted: "Such contracts only are excluded from the operation of the 17th section of the Statute of Frauds 'as primarily contemplate work and labor to be done, at the instance of the purchaser, and for his use and accommodation, so as to make the work and labor of the contracting vendor, or such as he may procure to be bestowed at his expense, the essential consideration of the contract.' "

In the instant case a particular stock of seed was furnished to Bell, the increase from which he agreed to "raise for and deliver to D. H. Gilbert." The method and manner of cultivation is prescribed by the terms of the contract, by which Gilbert is given the right, either for himself or through an agent, to "at any time enter the field and at his own expense make such examination, selections, or rejections as he deems desirable for the betterment of the crop for seed purposes, and he is not to pay for any necessary damage, if any, to the general crop, resulting from such work." Had this contract not been in writing, yet Bell had taken the seed thus furnished him and faithfully complied with the terms of the agreement as to how the seed should be grown and prepared, and had recognized all the rights and privileges given Gilbert under the agreement, could it be said that Bell could not have enforced a compliance on the part of Gilbert? We think that he could have done so. That the product of the culture, in point of fact, appears to have had a value to at least one person other than the seedman for whom they were grown is shown by the actual sale to the defendant in trover, and for an increased price; however, this can not negative the fact that the commodity was nevertheless of a "peculiar character," and was not only a particular seed stock, grown for a particular person, but was grown under particularly prescribed stipulations and under Gilbert's

right of direction; and since the contract itself says that the seed were to be raised for Gilbert, and that the compensation provided for by the agreement was "for his services in the growing and delivering" of the seed, which were "to remain the property of Gilbert," we see no sufficient reason why a different cónstruction must be enforced as a matter of law.

*Judgment reversed. Wade, C. J., concurs. Luke, J., absent on account of illness.*