Argued January 26, reargued July 5, reversed July 25, 1922.

## GOTHRO v. SOUTHERN OREGON CO.

(208 Pac. 705.)

**Brokers—Contract Secured by Broker Held not to be a Contract of Sale Entitling Him to a Commission.**

A contract negotiated by a broker between a land owner and a logging firm, whereby the latter was to cut and remove all merchantable timber, and the logging firm was given the exclusive right to all the timber logged, and was to sell the timber to responsible parties from whom the owner of the land was to collect the purchase price, which was to be divided, the logging firm accepting its portion in full payment for the work done, was not a contract of sale entitling the broker to a commission under a contract to pay for securing a purchaser.

From Coos: John S. Coke, Judge.

In Banc.

REVERSED.

For appellant there were a brief over the names of *Messrs. Griffith, Leiter & Allen* and *Mr. John G. Mullen,* with oral arguments by *Mr. Cassius R. Peck* and *Mr. Mullen.*

For respondent there was a brief over the names of *Messrs. Goss, Kendall & Murphy* and *Mr. Jay Bowerman,* with oral arguments by *Mr. John D. Goss* and *Mr. Bowerman.*

BURNETT, C. J.—The plaintiff and one Hockett made a contract with the defendant as follows:

"It is hereby understood and agreed

"By and between The Southern Oregon Company, an Oregon Corporation of Empire, Oregon, of the first part and George S. Gothro and C. G. Hockett of the second part as follows:

"That in case either or both of the parties of the second part bring to the party of the first, either by

104 Or.—31

person or by letter, a *bona fide* purchaser for all or part of the lands, mill or timber of the first party, the first party will pay to the second parties the sum of five per cent (5%) of the purchase price on or before thirty days after the signing, ensealing and delivery of deed or contracts of sale.

"This agreement is to be and remain in force for the term of sixty days from date hereof, except that in case of sale pending at the date of the expiration the time will be extended by the first party for the completion of said sale.

"It is mutually understood by the parties hereto that nothing in this agreement shall prevent the first party from selling any or all their lands, timber or other property themselves or by or through other agents."

(Signed by the parties November 15, 1917.)

Hockett assigned his interest in the contract to the plaintiff. Gothro claims to have been the moving cause and to have procured the firm of McDonald & Vaughan, hereinafter for convenience called the firm, to make with the defendant the following contract:

"This Agreement made and entered into this 31st day of January, 1918, by and between William Vaughan and J. J. McDonald, as partners doing business under the firm name of McDonald & Vaughan, of North Bend, Oregon, the first parties, and the Southern Oregon Company, an Oregon corporation, of Empire City, Coos County, Oregon, the second party, Witnesseth:

"That Whereas, the said second party is the owner of the lands hereinafter described and all the merchantable timber standing, lying, or being thereon, and desires that the same shall be cut, logged, removed and sold; and

"Whereas, the said first parties are engaged in conducting a logging business;

"Now, Therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the

said parties do contract and agree with each other as follows, to-wit: that the said first parties may enter in and upon the following described lands, to-wit: (Description omitted.)   And cut and remove all of the merchantable timber standing, lying or being thereon, and the said first parties do agree to so enter thereon and cut and remove the same as hereinafter provided.   The said second parties hereby giving and granting to the said first parties, their agents and employees the right to enter upon all of said above described lands and cut, log and remove all of said timber thereon, and use in the operation thereof any and all necessary or convenient logging tools, equipment or devices in order to so cut, log and remove said timber in the shortest time and at the least expense possible.

"The first parties do hereby agree that upon so cutting and removing said timber to deliver the same to the purchasers thereof at such point in the waters of Coos Bay as shall be agreed upon with such purchaser.

"It is also understood and agreed that all timber is to be cut into such lengths as will be most practicable and sell to the best advantage in the opinion of the first parties. * *

"It is understood and agreed that the first parties have the exclusive right to all of such timber so logged and that they will use their best endeavor and efforts to sell the same only to responsible parties at the highest and best prices and terms possible, and that they will use their best efforts to sell said logs for sums not less than $9 per thousand feet board measure and as much more as it is possible to get.

"It is understood and agreed, however, that any and all moneys to be paid by the purchaser of said logs shall be paid to and collected by the second party, and that the said second party will use its best efforts and endeavors to collect the purchase price therefor promptly and immediately at the time the same shall become due and payable, and that of the

amount so collected the following proportions thereof shall belong to and be the separate property of the respective parties hereto, and that the second party will deliver the proportion thereof so belonging to the said first parties immediately upon demand, which said proportions are as follows:

"In case the said purchase price shall be at the rate of $9 per thousand feet board measure, then of said sum the first parties are the owners of $5.50 thereof for each and every thousand feet board measure, and the second party is the owner of the sum of $3.50 per thousand feet board measure, and that any amount over and above said sum received for any of said logs shall belong to and be the property of said parties in equal proportions. It is further understood and agreed that in case any of such timber of any grade or kind shall be sold for a price of less than $9 per thousand feet board measure, the said first and second parties hereto will divide the difference between the said sum of $9 and the price actually received therefor into halves, and each party will deduct one-half of such difference from the proportion it or they would have received if the price received was $9 per thousand feet board measure. It being understood and agreed that the division of the price received shall be made upon each grade and each variety of timber separate from the other grades or varieties.

"And the said first parties hereby agree to accept and receive such proportion of the price that said timber shall be sold for in full payment for logging and delivering said timber, and said second party agrees to receive and accept such proportion of the purchase price above stated as full payment for said timber and the use and occupancy of said premises, and the rights and privileges herein granted, given and conferred to upon the said parties. The proceeds from the sale of said timber shall be determined and governed by the scale determined at the sale and the price sold therefor, and whenever said scale is

made and accepted it shall be final and binding upon both parties hereto.

"But it is further understood and agreed that at any time the party of the second part shall be dissatisfied with the price for which the parties of the first part are selling said timber, or any part thereof, it may, if it so desires, purchase those particular logs on which said price is unsatisfactory, and at the same price the said first parties are selling or offering to sell them for, and the said party in such event agrees to immediately pay to the first parties their share of the purchase price which shall be in the same proportion they would receive under the terms of this agreement, if said timber was sold to other parties, and further agrees to accept immediate delivery from the first parties and hold the same in its own boom sticks or booms and at its own risk. * *

"It is also understood and agreed that if during the life of this contract that the price obtainable for said timber should be such that in the opinion of both parties it would not be profitable to continue logging and selling the same, then in that event the first parties may cease cutting, logging and removing said timber until such time as in the judgment of the parties hereto it will be profitable to continue the same, but it is distinctly understood and agreed that in case said logging operations are suspended under those provisions, the time for the completion of said work shall be extended a further length of time equal to such suspension; provided, further, that in case said logging operations are suspended for a period of one year, then in that event either party hereto may terminate this contract by giving the other thirty (30) days' written notice of its intention and desire so to do."

(Signed by the parties January 31, 1918.)

Besides setting forth the contract of employment and the efforts of himself and Hockett thereunder, the plaintiff alleges "that up to the time of filing this

complaint the said defendant had received in cash upon the sale of said timber so made as hereinbefore set forth, the sum of one hundred thousand dollars," and claims as due from the defendant 5 per cent of that sum. A general demurrer to the complaint was overruled. Denials and some affirmative defenses were interposed, which it is deemed unnecessary to consider, because the whole issue properly may be determined on the demurrer to the sufficiency of the complaint.

As the result of a jury trial, a verdict was returned in favor of the plaintiff. From the ensuing judgment the defendant appealed.

For convenience the contract with Gothro and Hockett will be called Exhibit "A," and the agreement between the defendant and McDonald & Vaughan will be called Exhibit "B." Reduced to its lowest terms, the complaint alleges in substance that Gothro was employed to find a purchaser for the timber in question, for which the defendant was to pay 5 per cent of the purchase price, and that Gothro procured McDonald & Vaughan to execute with the defendant Exhibit "B." Counting upon this as a sale to the firm, he demands his fee. The question to be determined is, whether or not Exhibit "B" amounts to a sale of the timber which was the subject matter of Exhibit "A." If the transaction delineated in Exhibit "B" constitutes a sale to McDonald & Vaughan, and if they are to be considered in the words of Exhibit "A," "*bona fide* purchasers" of the timber, the plaintiff should prevail. But if Exhibit "B" does not describe a sale or McDonald & Vaughan did not become *bona fide* purchasers of the timber, the defendant should prevail, because in the latter instance the plaintiff did not perform his

part of the contract embodied in Exhibit "A," to produce a *bona fide* purchaser.

As to the construction and legal effect of Exhibit "B," we quote from *Union Stockyards & Transit Co.* v. *Western Land & Cattle Co.*, 59 Fed. 49, 53 (7 C. C. A. 660):

"In the solution of that question, we must search for the intention of the parties, as it may be gathered from a reading of the entire instrument, and not from any separate provision of it—the real design of the contracting parties, as disclosed by the whole contract. We should not regard any mere formula of words, nor permit parties to avoid the statute by any cloaking of intent. * * The true intent and meaning of the contract does not depend upon 'any name which the parties may have given to the instrument, and not alone on any particular provisions it contains, disconnected from all others, but on the ruling intentions of the parties, gathered from all the language they have used. It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account': *Heryford* v. *Davis*, 102 U. S. 235, 243 (26 L. Ed. 160)."

This excerpt is particularly applicable to the language of Exhibit "B," to the effect that the firm "shall have the exclusive right to all of such timber so logged and that they will use their best effort and endeavor to sell the same," etc., and to the other clause in substance that if the defendant here becomes dissatisfied with the price for which the firm is selling the timber it may purchase the particular logs at the unsatisfactory price upon which they are offered, and pay the firm its proportionate share of that price. These covenants must be read in connection with all the rest of the contract, and cannot be used as a mere hook upon which to hang a sale,

despite the remainder of the agreement. As said in *McCrory* v. *Hamilton,* 39 Ill. App. 490:

"The mere fact that the witnesses may use the terms sell or sale or that the parties to a given transaction used such terms does not operate to make the same a sale, if upon consideration thereof it appears there was none."

Adverting to the terms of Exhibit "B," we find in the preamble a statement of the condition of the parties: First, that the defendant is the owner of the lands and timber and that the firm of McDonald & Vaughan is engaged in conducting a logging business. This does not indicate any intention that the parties should assume the relation of seller and buyer. Immediately, the agreement states that in consideration of mutual covenants and agreements the parties contract that the firm may enter upon the described lands and cut and remove the merchantable timber, and the defendant gives them the right of entry for that purpose. Further, the firm agrees to deliver the logs to the purchasers thereof. Manifestly, if they themselves were the purchasers of the timber, no such covenant as that would have been contained in the writing. The agreement that the firm shall have the exclusive right to such timber so logged means no more than the right given it under the contract. The term "exclusive right" was evidently added as a cautionary measure more explicitly to define the rights enumerated in the contract. The circumstance that the defendant was to collect all the moneys due from purchasers of the logs contradicts the idea that they were sold to the firm. No mention is made of any property in anything, in the firm, until we come to the provision about dividing the proceeds of the sale. Then the agreement specifies

"that of the amount so collected the following proportions thereof shall belong to and be the separate property of the respective parties hereto." Still further in the contract, "the first parties [McDonald & Vaughan] hereby agree to accept and receive such proportion of the price that said timber shall be sold for in full payment for logging and delivering said timber." This was not to be received in payment for any property that the firm had in the timber as purchasers, but for services rendered as stated.

In fact, taking the whole contract together, McDonald & Vaughan were excluded from the category of purchasers, for they were only to log the timber and deliver it to purchasers. They could not deliver it to themselves. They must be excluded from consideration as purchasers. Many details are described about the manner in which the logging should be carried on, "in a good, workmanlike manner," etc. If this were a sale outright to the firm, or in other words if the firm became a *bona fide* purchaser of the timber, it would be utterly useless for the defendant to prescribe the manner in which the logging should be carried on. Moreover, if this were an absolute sale, it would be idle to include in the contract provisions about suspending operations or finally terminating the contract. A sale is an executed contract. It is not executory. It requires but a moment's thought to see that if, during the progress of the logging, a forest fire had destroyed the timber, the loss would have fallen not upon the firm but upon the defendant. Again, even if the timber had been felled, cut into lengths and rafted, and a storm had arisen and carried the raft out to sea where it broke up and was lost, it would not have

been the property of the firm that was destroyed, but that of the defendant.

With these recitals and estimates of the terms of the contract, it is well to consider a few precedents. The principle is succinctly stated in 24 Am. & Eng. Ency. of Law, 1026:

"In the case of goods consigned to be sold for the consignor, who is to regulate the price and terms of sale, the factor is an agent and the contract one of bailment. And this is so though the consignment is made on a *del credere* commission. If, however, the consignee or factor is to sell upon terms fixed by himself, and is bound to pay to the consignor a fixed price, the contract is one of sale."

Here, the firm indeed fixes the price at which the logs shall be sold, but it nowhere agrees to pay any fixed price to the defendant. Throughout the contract there is not a word obligating McDonald & Vaughan to pay anything for the logs. In the early case of *Barker* v. *Roberts,* 8 Me. 101, we find substantially a parallel situation. Cowan & Oaks, corresponding to McDonald & Vaughan here, agreed as follows with Barker & Crosby:

"That the said Cowan & Oaks on their part agree to take, at the Sunkhaze boom, a certain lot of logs, at the scale known by the name of the Babcock logs, and scaled by Daniel Davis, to saw and run to Bangor all the boards said logs make, free of any expense to the other party, as soon and as fast as one saw can saw them; and Barker & Crosby agree to dispose of said boards free of any commission, either to sell or ship to Boston, as they the said Barker & Crosby may see fit; and allow to the said Cowan & Oaks all they shall net over seven dollars per thousand. It is understood that the said Cowan & Oaks risk the logs after they are scaled, and risk the boards after the logs are sawed, until they are marketed."

Cowan & Oaks sold the logs instead of rafting them to Bangor. Barker & Crosby sued to recover them from those who purchased from Cowan & Oaks. The defendants contended that the transaction amounted to a sale of the logs to Cowan & Oaks and by the latter to the defendants, but the court held that it was a mere bailment, although the firm was responsible for the logs.

*In re Columbus Buggy Co.*, 143 Fed. 859 (74 C. C. A. 611), was a case in which the opinion was written by Judge Sanborn, wherein he said:

"An agreed price, a vendor, a vendee, an agreement of the former to sell for the agreed price and an agreement of the latter to buy for and to pay the agreed price are essential elements of a contract of sale. * *

"A contract between a furnisher of goods and the receiver that the latter may sell them at such prices as he chooses, that he will account and pay for the goods sold at agreed prices, that he will bear the expense of insurance, freight, storage and handling and that he will hold the unsold merchandise subject to the order of the furnisher discloses a bailment for sale and does not evidence a conditional sale. It contains no agreement of the receiver to pay any agreed price for the goods. * * The fact that such a contract provides that the receiver of the goods may fix the selling prices and may retain the difference between the agreed prices of the accounting and the selling prices to recompense him for insurance, storage, commission and expenses does not constitute the contract an agreement of sale. It still lacks the obligation of the receiver to pay a purchase price for the goods and the obligation of the furnisher to transfer the title to him for that price."

A long list of authorities is cited in support of that proposition.

In *Johnson v. Allen,* 70 Conn. 738 (40 Atl. 1056), the defendant was to sell grain which the plaintiff put in his possession, and settle for it as fast as sold at the purchase price and one cent per bushel. This was held to be a bailment, although the defendant sold to whom and at such prices as he chose.

In *Union Stockyards & Transit Co.* v. *Western Land & Cattle Co., supra,* the defendant was to transport cattle to its farm, feed and care for them, pay for those dying, strayed or stolen, and when those remaining were sold was to receive the surplus over a certain amount per head. This was held to be a bailment. It is said in the opinion in that case:

"It is of the essence of a contract of sale that there should be a buyer and a seller; a price to be given and taken; an agreement to pay, and an agreement to receive. 'Sale' is a word of precise legal import. 'It means, at all times, a contract between parties to give and to pass rights of property for money, which the buyer pays, or promises to pay, to the seller, for the thing bought and sold.' * * In a contract of sale there is this distinguishing test, common to an absolute and to a conditional sale: that there must be an agreement, expressed or implied, to pay the purchase price."

The court ended its discussion of the contract in these words:

"There is wanting here an essential element of a sale, an agreement to pay a price."

*Sturm* v. *Boker,* 150 U. S. 312, (37 L. Ed. 1093, 14 Sup. Ct. Rep. 99, see, also, Rose's U. S. Notes), was a case in which the Supreme Court of the United States had under consideration a transaction by which a concern manufacturing firearms had shipped to Sturm a large invoice of such goods to be dis-

posed of by him in Mexico and accounted for at the best terms possible, the profit accruing to Sturm to be one half of the surplus over the invoice price. The court, speaking by Mr. Justice JACKSON, used this language:

"The recognized distinction between bailment and sale is that when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed. On the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and the title to the property is changed; the transaction is a sale. * *

"The agency to sell and return the proceeds, or the specific goods if not sold, stands upon precisely the same footing, and does not involve a change of title. An essential incident to trust property is that the trustee or bailee can never make use of it for his own benefit. Nor can it be subjected by his creditors to the payment of his debts."

In this instance the only dominion vested in the firm was to cut the timber into merchantable lengths and sell it. It would have broken its covenant with the defendant if it had sawed the logs into lumber and constructed buildings of the same, or disposed of them otherwise than by delivering them to purchasers.

In *Sattler* v. *Hallock,* 160 N. Y. 291 (54 N. E. 667, 73 Am. St. Rep. 690, 46 L. R. A. 679), a number of farmers agreed with a firm to furnish to the latter pickles, cabbage and so on, to be processed and sold by the firm, the latter receiving 35 per cent of the amount realized. The court held that this was a bailment and that the ownership of the farm products remained in the farmers. Likewise, in *Stewart* v.

*Stone,* 127 N. Y. 500 (28 N. E. 595, 14 L. R. A. 215), milk was delivered to a cheese-maker, who was to manufacture the same into cheese, sell it and distribute the proceeds to the owners of the milk. This was held to be a bailment "for a specific purpose from which he had no right to depart."

In *Lee* v. *State,* 81 Tex. Cr. Rep. 117 (193 S. W. 313, 321), there is a full discussion with ample citation of authorities on the subject, from the earliest times, which may be read with profit but which are too numerous and lengthy to be repeated here. See also: *Slaughter* v. *Green,* 1 Rand. (Va.) 3 (10 Am. Dec. 488); *Seymour* v. *Brown,* 19 Johns. (N. Y.) 44; *Schenck* v. *Saunders,* 79 Mass. 37; *Patrick* v. *Colorado Smelting Co.,* 20 Colo. 268 (38 Pac. 236); *Gregory* v. *Stryker,* 2 Denio, 628; *Mallory* v. *Willis,* 4 N. Y. 76; *Johnson* v. *Miller,* 16 Ohio, 431; *Gilbert* v. *Copeland,* 22 Ga. App. 753 (97 S. E. 251); *Finch* v. *McClellan* (Ind. App.), 130 N. E. 13; *Pierce* v. *Sherich,* 3 Hill (N. Y.), 28.

Like Exhibit "A," Exhibit "B" is a contract to find a purchaser for the timber, except that in the latter the firm was to put the timber into merchantable condition and to deliver it to a purchaser secured by the firm. McDonald & Vaughan themselves were not purchasers. They could not be at once buyers and sellers. The only duty or obligation imposed upon them in that respect was to sell and not to buy. By the very terms of the stipulation, they agreed "to accept and receive such proportion of the price that such timber shall be sold for in full payment for logging and delivering said timber." It is not recognized or pretended that they had any property in the timber itself. The plain deduction is, that Exhibit "B" constitutes a contract

for bailment and not ownership of the timber, in which McDonald & Vaughan were bailees charged with the duty of preparing the timber for sale and selling it to purchasers. They were themselves in no sense *bona fide* purchasers, for one very good reason that they never agreed to pay any purchase price to the defendant.

Even if Gothro had induced McDonald & Vaughan to execute this contract embodied in Exhibit "B," he did not perform his covenant in Exhibit "A" to find a *bona fide* purchaser. He did not produce a purchaser, but only a bailee broker. He did not find anyone who paid or agreed to pay anything for the logs. This being true, he is not entitled to any broker's fee contemplated by Exhibit "A." The complaint, based as it is upon the two contracts, Exhibit "A" and Exhibit "B," does not state facts sufficient to constitute a cause of action. The judgment should be reversed.                REVERSED.

Mr. Justice McBRIDE dissents.