[No. 18896. Department One. February 25, 1925.]

## H. P. NIELSEN, *Respondent*, v. ALLING WOODRUFF, *doing business as Woodruff Seed Company, Appellant.*[1]

SALES (79, 80)—CONTRACT—PERFORMANCE OR BREACH—ACCEPTANCE —DELAY IN REJECTION OF GOODS. Where seed is raised for a wholesale dealer, who, under a contract calling for labor, holds the title to the crop, the dealer is under no obligation to reject the seed within a reasonable time after delivery by the grower because of its failure to conform to the requirements of the contract.

CROPS (3)—SALES (30)—OWNERSHIP—CONTRACT—CONSTRUCTION— QUALITY OF GOODS. A contract requiring a grower to "care for, harvest, cure, and thresh" a crop of seed and deliver the "merchantable" seed, is not performed by delivery of seed so full of moisture that it begins to mould within a few days, where the preponderance of the testimony was to the effect that such seed was not merchantable, and in the absence of any general custom that the dealer was to dry the seed (TOLMAN, C. J., dissenting).

Appeal from a judgment of the superior court for King county, Tallman, J., entered February 19, 1924, upon findings in favor of the plaintiff, in an action to foreclose a laborer's lien, tried to the court. Reversed.

*Reames & Frye,* for appellant.

*Howard A. Adams* and *Joseph Matsen,* for respondent.

ASKREN, J.—Plaintiff brought this action to foreclose a laborer's lien, and upon a trial thereof the court entered a personal judgment in his favor.

The facts are as follows: Plaintiff, as owner of certain farm lands in King county, entered into a contract with defendant, wholesale seed dealers, for the growing of radish seed during the year 1922. The parties evidenced their contract by a written agreement, as follows:

[1]Reported in 233 Pac. 1.

## "Contract.

"I, H. P. Nielsen, of Renton P. O., Renton County, Washington State, ........................Township, ........................ Section, hereby agree to plant at the proper season on good clean land, properly fitted, located and described, viz.,    .    .    .    on my ranch at Renton, for Woodruff Seed Co., of Seattle, Wash., the following seed crops, care for, harvest, cure, and thresh them properly and deliver the entire merchantable seed product therefrom, cleaned as well as can be with ordinary farm machinery, to Woodruff Seed Co., f. o. b. cars or dock, Seattle, Wash., at such time as shall be mutually agreed upon after harvest on or before Sept. 15, 1922.

"I agree that if the seeds delivered by me are an acceptable sample and of satisfactory vitality, that is, eighty-five per cent or better, but require further cleaning, milling or hand picking in order to make them suitable for seed purposes, Woodruff Seed Co. may do such work at their own expense and settlement shall be made at their net weight after such cleaning, milling or hand picking; provided, however, that if the said seeds delivered by me are in such condition that they cannot be made acceptable and suitable for seed purposes without an unreasonable amount of labor and expenses, Woodruff Seed Co. may reject them and shall not be held for any portion of them.

"I agree also that the crops grown by me shall be planted not less than 100 feet from any like crop and that Woodruff Seed Co. shall have the privilege of removing from the growing crops, and destroying the same, without interference by me, all plants that are untrue, mixed, or otherwise calculated to injure the seed product, and in any event such plants shall not in any manner be saved by me for seed purposes.

"I agree also to plant under this contract such seed stocks as shall be furnished me by Woodruff Seed Co., which shall be returned to them out of the crop therefrom when delivered and that said seed stocks and crops therefrom shall be and remain at all times the property of Woodruff Seed Co., and I will in no wise dispose of any portion of them except as provided in

this contract, and should the crop, through any legal process, or any other cause pass from my control, Woodruff Seed Co. may take possession of same wherever found.

"I also agree should I fail to care for the crop as provided above Woodruff Seed Co. shall have the right of entry to same and may complete my part of the contract and all costs connected therewith are to be paid by me to Woodruff Seed Co.

"I agree also, should the crops through partial failure be no more even than seed planted, that I will harvest, care for and deliver whatever there may be as provided in this contract. In case the crop shall not be enough to return the seed stock as provided therein, I further agree to pay the difference between the seed stock furnished and the crop at the agreed contract price.

"It is mutually agreed that whatever splits, damaged grains, or other material may be removed from the crop in order to make it merchantable sample and suitable for seed purposes, shall be the property of the party to this contract removing it.

"Woodruff Seed Co. on their part agree to deliver the seed stocks to H. P. Nielsen f. o. b. cars or dock at Seattle, Wash.

"They agree also to pay the below annexed prices for all acceptable seeds suitable for seed purposes, delivered in accordance with the conditions of this contract after the seed stocks furnished have been deducted therefrom.

"Terms of payment: Cash within 30 days, after receipt, and acceptance of the seeds by Woodruff Seed Co., at Seattle, Wash.

"This contract is written subject to acceptance by Woodruff Seed Co. of Seattle, Wash.

"Acres                Kind                Price per lb.
   10            Radish—Scarlet Globe            14c
                "Dated March 4, 1922.
"Woodruff Seed Co.                        H. P. NIELSEN,
   "By Alling Woodruff.
   "As contractor and owner of land on which seed are to be grown.

"As contractor and cash renter of land on which seed are to be grown.

"As contractor and crop renter of land on which seeds are to be sown.

"I, ........................................ being the owner of land on which ........................... has contracted to grow seeds as per above contract, hereby agree that I will in no way hold any portion of this crop for rental or use of said land but will accept as my rent a portion of the return from said crop as agreed upon between said renter and myself.

................................................"

Acting under this contract, the plaintiff received the seed for planting, and raised and harvested the increase thereof. There is some dispute in the testimony as to whether the failure to deliver on September 15, 1922, was due to the plaintiff being unable to secure a thresher or because the date was postponed by mutual agreement. The crop, after being cut, was placed in stacks, and when the time came for threshing, about the middle of November, it was found that rain had penetrated the stacks to the extent that the outside portions thereof were required to be cut off. After threshing, delivery of seventeen sacks was made to the defendant in Seattle. At the time of delivery one Coffin, agent for defendant, objected to the condition of the seed because, as he said, when he placed his hand in the sack the seeds were hot, but he kept the same and suggested that the remainder of the seeds be placed in a barn belonging to the plaintiff and be turned over every day in order to allow them to dry. In spite of this endeavor, the seeds soon began to spoil, and at the time of the delivery, December 9, were getting mouldy. They were then artificially dried by the defendant, and when tested showed a germination of only thirty-eight per cent. The law of this state re-

quires at least sixty per cent germination, and the contract provided for eight-five per cent.

In January, 1923, the plaintiff wired the defendant to either accept or reject the seed, and the defendant answered as follows:

"Your radish seed in present condition rejected if by remilling we can make it grow eighty to eighty-five per cent we will accept it this offer without waiving any rights in our contract we want to accept this radish if we can get our customers to accept it from us."

The plaintiff, however, within a few days after the last delivery, December 9, had filed his lien for labor, and after receipt of this telegram and within the time provided by law, brought his action to foreclose. It will be seen from the foregoing that the seeds delivered did not test as required by the contract, but the trial court entered judgment for the plaintiff upon the ground that the defendant had not rejected the seed within a reasonable time after delivery; that such reasonable time would have been from three to seven days, and that rejection was not made until after the seasonal market for radish seed had expired. The defendant appealed therefrom.

Appellant contends that the court erred in holding that they were required under their contract to reject the seed within a reasonable time, and we agree with this contention. It is a well settled rule that such a duty applies to executory contracts between vendor and vendee, and the reason for it is to allow the owner to take his property and sell or dispose of it as he sees fit, and thus minimize his loss. But the rule does not apply in those cases where the title to the property rests in the person to whom delivery is made. The property is his and no obligation rests upon him to make rejection, because he has the right under the law

to keep that which is his and to assert a breach of contract when he is sued thereon.   The rule is well stated in 6 R. C. L. 994:

"The reason upon which the doctrine governing executory contracts for the sale of chattels subsequently delivered rests is inapplicable to contracts for the manufacture of articles from materials furnished to the manufacturer by the other party to the contract. The title to the things manufactured is in the owner of the materials, whether they conform to the contract or not.   The claim to the other party is for work and labor.   The employer may await the presentation of the claim of the other party before acting.   His retention of the articles manufactured is the exercise of an absolute right, and he is neither bound to inspect the articles nor to notify the other party of his objections.   The omission to object may, in many cases, be material evidence on the question of performance, and, in case of continuous deliveries of articles manufactured from time to time, the duty to speak after knowing the defects may arise.   But ordinarily the owner of materials who employs another to manufacture them into garments or chattels of any description does not lose his property in the materials, nor is he precluded by receiving the manufactured articles from asserting his title thereto, and at the same time resisting a recovery for the value of the work, on the ground that the workman has not performed his contract."

Applying this rule to the present case, what difference could it make if rejection was not made until the seasonal market for radish seed was over, if the respondent had no right to take the seed and sell it to another?   The contract provides that the title to the crop is in appellant, and that this is the true construction neither party has denied, for the action was brought for labor and services.   Contracts of this character have been frequently before the courts for adjudication, and it has been uniformly held that such

a contract calls for labor, and that the crop produced belongs to the party furnishing the seed. In *Gilbert v. Copeland*, 22 Ga. App. 753, 97 S. E. 251; *Ferry & Co. v. Forquer*, 61 Mont. 336, 202 Pac. 193, and *Ferry & Co. v. Smith*, 36 Idaho 67, 209 Pac. 1066, will be found constructions of contracts almost identical with the one in controversy.

The only other contention raised in the brief of respondent is that he was not required by the contract to deliver "dry" seeds, and that in 1918 he grew a like crop for the appellant and that year the crop was so damp that appellant artifically dried the same. The contract provides that respondent is to "care for, harvest, cure and thresh them properly and deliver the entire merchantable seed product." There is a conflict in the testimony as to whether the word "cure" in the contract means to dry before threshing; whether "drying" and "curing" are synonymous; and whether "merchantable seed" means seed that is dry.

Assuming that these words in the contract require testimony to determine their meaning, we think the preponderance of the testimony shows that seed so full of moisture that it begins to mould within a few days is not "merchantable seed" within the meaning of the contract. Nor is the fact that, in the year 1918, the appellant dried radish seed grown by respondent sufficient evidence to require us to hold that the parties to the agreement intended that the seed should be dried by appellant in 1922, in the absence of any showing that such a general custom or an agreement therefor existed.

We conclude, therefore, that since there was no obligation upon appellant to timely reject the seeds delivered, and since there was no delivery of seed which tested as required by the contract, respondent has failed in his proof.

The judgment of the trial court is reversed, with instructions to dismiss the action.

Parker, Main, and Bridges, JJ., concur.

Tolman, C. J. (dissenting)—I concur in all of what is said by the majority, save only the holding that respondent did not cure the seed as required by the contract. It should be borne in mind that respondent was a farmer, and the purpose of the contract was that he should perform the services of a farmer in good and farmer-like fashion. The language of the contract, "care for, harvest, cure, and thresh," should therefore be construed with that fact in mind. So construed, and giving effect to the order in which the words are used, it seems to me apparent that respondent contracted to cure the crop only in the natural way, such as good farming indicated, such curing to precede the threshing and to be such as to make the crop fit for threshing. As I read the record, this was done and respondent fully performed his duty. The title to the seed being in the appellant, it was its duty to follow what appears to have been the custom and itself provide such artificial curing as the seed might require after the threshing to make it merchantable. For this reason, I think the judgment appealed from should be affirmed.