## THE PERTH AMBOY.

### THE ROCKHAVEN.

Nos. 253, 310.

District Court, D. Massachusetts.

April 9, 1931.

In case No. 253:

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant.

Elbridge R. Anderson, of Boston, Mass., for garnishee.

Macklin, Brown, Lenahan & Speer, of New York City, for claimant.

Storey, Thorndike, Palmer & Dodge and Raymond S. Wilkins, all of Boston, Mass., for American Cyanamid Co.

In case No. 310:

Burnham, Bingham, Gould & Murphy, of Boston, Mass., for libelant.

Macklin, Brown, Lenahan & Speer, of New York City, for claimant.

Storey, Thorndike, Palmer & Dodge, of Boston, Mass., for American Cyanamid Co.

BREWSTER, District Judge.

On December 24, 1929, the barge Rockhaven, carrying a cargo of copper concentrates and crude ore, was stranded while being towed through Arthur Kill by the steam tug Perth Amboy. Libels, to recover resultant damages, have been brought by the owner of the barge and by the owner of the cargo against the Perth Amboy. The two causes were tried together.

Statement of Facts.

The barge Rockhaven, carrying about 1,330 long tons of copper concentrates and crude ore, was bound on a voyage from Maine to Chrome, N. J., which lies near the southerly end of Arthur Kill, west of Staten Island. The barge was 188.9 feet long and had a draft at the time of the stranding of 14 feet. She had no motive power. The steam tug Perth Amboy is 138 feet long, and her wheelhouse was about 20 feet abaft her stem.

On the evening of December 24, 1929, at Poor House Anchorage, East River, N. Y., the barge Rockhaven was made fast in the usual way alongside of the tug on the latter's port side. The bow of the barge was about 59 feet forward of the bow of the tug and 79 feet forward of the wheelhouse. Around 8 o'clock in the evening, the tug with her tow left Poor House flats and proceeded down through the channel in Arthur Kill, which lies between the New Jersey shore and Staten Island. They proceeded down the westerly side of Prall's Island through what is known as the Northwest Reach. As the channel rounds Tremley Point on the New Jersey shore, its course changes, first near the southerly end of Prall's Island, and about 1,000 feet below at the northerly entrance of the Southwest Reach, so called, it again changes to SW½S. The Southwest Reach begins about 1500 feet northeasterly of the plant of the American Cyanamid Company, impleaded in these proceedings, and the channel runs in a straight line as it passes the Cyanamid Company's works.

At a point on the easterly side of the Kill and opposite the plant of the American Cyanamid Company, there is a charted and well-known shoal known as the "11-foot rock." The chart also shows that northerly of this rock and narrowing the channel at this point there is shallow water of only 14 feet depth at mean low tide. The average depth of the channel through the Kill is approximately 27 feet. Just above the narrow portion of the channel, on the Staten Island side of the Southwest Reach, was a red buoy which not only served to mark the easterly bank of the channel, but to warn mariners of the 11-foot shoal and the shallow waters lying northerly of the rocks.

The night was clear and cold, with light, westerly, or northwesterly winds. The tide was ebb, and the current favored the tow. As the captain of the tug navigated his tow around Tremley Point, proceeding at a rate of 7 knots an hour through the water, he encountered a cloud of vapors and smoke.

The captain testified that, when he ran into the smoke, he reduced his speed to half speed, but was unable to say at what rate he continued on down the channel. Others on the tug and barge failed to notice any appreciable reduction in speed after the smoke was reached.

According to the evidence of the captain of the barge, the tow had proceeded "just a little way" after encountering smoke when the barge hit the easterly bank of the channel. The location of the stranded barge was about 100 feet from the red buoy which then appeared off the starboard quarter. At this point, according to the chart, the area of shallow water projects into the channel just above the 11-foot shoal. The tide was unusually low at about 10:30 o'clock p. m. when the barge stranded, and soundings showed a depth of only 12 to 13 feet. That the level of the water at the time of the stranding would be below mean low water was predicted by government tide tables. After the barge struck, she began to fill in the forward compartment, and it was impossible to float her even at high tide. She was not taken off until the next day. That the barge ran upon a well-known shoal cannot be doubted.

The captain of the tug was unable to

state definitely what course he followed in rounding Tremley Point. The best he can give is that he was within the limits of the channel. From all the evidence I find that he was not shaping his course down the westerly, or starboard, side of the channel. On the contrary, the location of the stranded barge admits of only one conclusion, and that is that the tug had adopted a course in rounding Tremley Point which brought the tow over to the extreme easterly edge of the channel at a point where the charted depth of the water at mean low water was only 14 feet, which was precisely the draft of the barge, and where, on the day in question, the water being below mean low level, was of insufficient depth to enable the barge to pass without striking the bank.

Navigators had been cautioned by the United States Army engineers to use the New Jersey side of the dredged canal when passing Tremley Point because "numerous rocky shoals lie in the easterly or Staten Island side of this stretch of channel commencing opposite the mouth of the Rahway River and extending upstream."

The captain of the tug testified that when he first encountered the smoke he was some distance from the red buoy, and that he immediately sent one of the crew to look for lights along the shore while he himself looked for the red buoy. He had run past the buoy because, when he first saw it, it was some 35 feet away on the port side and very near amidships on the barge. He then swung his tug to the westward. · At this time he must have been well over on the port side of the channel, because, notwithstanding his attempt to turn the barge to the starboard side of the channel, the barge struck the easterly bank.

The witnesses indicated on the chart the point where the tow first entered the smoke as about 1,200 feet northerly of the plant of the Cyanamid Company. It is difficult to reconcile this evidence with the government weather reports, which showed that on the night in question the wind was light and coming from the northwesterly direction, and the testimony of witnesses that the wind was westerly. A westerly wind might have carried the smoke from the Cyanamid plant across the channel at or near the buoy. The buoy was between 800 and 900 feet below the indicated point, and it is extremely unlikely that smoke drifted as far up the stream as is claimed by the witnesses. The conclusion follows that the tow was nearer the buoy before any smoke interfered with the visibility.

This fact, together with the position of the stranded barge as it lay immediately after she struck, would clearly indicate that the master had, even before he reached the smoke, so navigated his tow as to bring the barge over to the extreme easterly side of the channel.

In December, 1929, the Cyanamid Company was principally engaged in making fertilizer. Whatever smoke drifted across the channel must have come from nine fertilizer driers, each of which had a stack approximately 40 feet from the ground. Between these drier stacks and the Kill were a number of other buildings of the company, the lowest of which was 50 feet high and one 80 feet high. Strictly speaking, it was not smoke, but steam vapor, which came from the driers, but which, in cold weather, would condense sufficiently to form a cloud of more or less density. This vapor was diluted with fresh air, and, in the nature of things, could not at any time have been of sufficient density to seriously interfere with navigation on the channel.

There was a conflict in the evidence as to the extent to which this cloud of vapor cut down visibility. The captain of the tug said it was impossible to see lights on the shore, and he was therefore unable to determine in what direction he was going or how far he had deviated from the usual course. It is but natural that the captain, in his desire to find excuse for his conduct, should somewhat exaggerate the density of the smoke. The captain made no mention of any smoke in his log. The captain of the barge testified that there was never a time after they entered the smoke that he could not see lights. "They would be very dim, but I think we could see them all the time." Other witnesses testified that lights could be seen on vessels tied up to the docks of the Cyanamid Company, and nearly all but the captain agreed that, with the exception of intermittent intervals of short duration, it was possible to discern objects on the New Jersey shore. There was also evidence that the smoke was high, so that the nearer the water one stood the greater the visibility.

As to lookouts, I find that, up to the time the tug ran into the smoke, no lookout had been stationed on the bow of the tug, and at no time was a lookout stationed on the bow of the barge. The master of the barge was in the wheelhouse with the captain. The wheel of the barge had been lashed a little to port in order to overcome the tendency of the tug to twist her to port. A member of

her crew was on the barge near the wheel-house awaiting any orders from the tug, but none were received from either the captain of the tug or of the barge. Some doubt arises from the testimony as to whether a sufficient lookout was at any time maintained on the tug, but, in view of my conclusions, this question does not become important.

The captain of the tug had full charge of the navigation of the tow, and he admitted that he was aware of the 11-foot shoal and shallow water in the vicinity of it, and that prudent navigation would not admit of any attempt to tow the barge through 14 feet of water. He also testified that he had previously encountered smoke at the same place, and from other witnesses, produced by the claimant, it appeared that such encounters were not to be wholly unexpected.

### Conclusions of Law.

■ I accept the proposition, urged upon the court by the owner of the tug, that the burden is upon the barge, which alleged a breach of duty to show that there had been negligence and unskillfulness in performing the contract undertaken to its injury (The W. H. Baldwin [C. C. A.] 271 F. 411), and that the liability of the tug is not that of insurer, but it is only held to the exercise of reasonable skill and care such as a prudent navigator would exercise under similar circumstances (Aldrich v. Pennsylvania R. R. Ca. [C. C. A.] 255 F. 330). But when the damage is caused by the stranding of the barge upon well-known shoals, on the wrong side of a charted channel, a prima facie case of negligence is made out, and the burden then passes to the tug to explain the cause of the disaster in such a way as to exonerate it from liability. Susquehanna Coal Co. v. Eastern Dredging Co. (D. C.) 200 F. 817; Burr v. Knickerbocker Steam Towage Co. (C. C. A.) 132 F. 248; Lehigh Valley Transp. Co. v. Knickerbocker Steam Towage Co. (C. C. A.) 212 F. 708; The Neponset (D. C.) 251 F. 752; The Coastwise (C. C. A.) 233 F. 1; The Taurus (D. C.) 91 F. 796.

Upon the facts above recited, I have reached the conclusion that the captain of the tug was at fault in two respects: (1) In his failure to adopt a proper course as he came into the Southwest Reach; and (2) his failure to station proper lookouts.

■ Before the captain of the tug had encountered the difficulties which he seeks to hold responsible for the accident, he, if he had acted prudently, would have rounded the point closer to the New Jersey shore and would not have allowed his tow to swing far over to the port side of the channel. As was said in The Mascot (D. C.) 48 F. 917, 918: "The general knowledge that a certain course was the proper course to take in consequence of some obstructions, and that it was the custom uniformly to adhere to that course, is sufficient to put upon the tug the risk of departing from it without reason."

■ No adequate excuse can be found for the failure of the tug to observe applicable rules of navigation or to heed the published warning of the United States engineers. The John L. Hasbrouck, 93 U. S. 405, 23 L. Ed. 962; The Arlington (C. C. A.) 19 F.(2d) 285, 54 A. L. R. 101; The Coastwise, supra; The S. W. Morris (D. C.) 59 F. 616.

■ The master of the tug was required to know the width and course of the channel at Tremley Point and to be aware of the existence of the dangers along the bank on the Staten Island side. The Robert H. Burnett (D. C.) 30 F. 214; The Henry Chapel (D. C.) 10 F. 777; See, also, The Mercury (D. C.) 291 F. 797.

■ The master must be held equally at fault whether this deviation from the usual and customary course was due to inattention or to excessive speed aided by the force of the current. A duty rested on the tug to keep the barge within the limits of the channel. The Westerly (C. C. A.) 249 F. 938; The Convoy (D. C.) 12 F.(2d) 93.

■ As to the failure to maintain an adequate and proper lookout, we must consider that the tow was proceeding in the nighttime down the Kill, approaching a point where the direction of the channel changed more or less abruptly, and where it was prudent to keep on the starboard side of the channel and also that at this point the captain, from past experience, had reason to anticipate that visibility might be obscured by drifting clouds of smoke or vapor coming from the works of the Cyanamid Company or other plants on the New Jersey shore. Under such circumstances the reasonably prudent and skillful navigator would have deemed it necessary to have stationed at the bow of the tug or barge a competent lookout to warn the captain in case he was getting too near the port side of the channel. The Oradel-Pittsburgh, 1928 A. M. C. 806 (Oral); The Sagamore (C. C. A.) 247 F. 743; The Williamsport (C. C. A.) 74 F. 653; Dahlmer v. Bay State Dredging & Contracting Co. (C. C. A.) 26 F.(2d) 603;

The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943.

Furthermore, when the captain found that the smoke was interfering with the visibility, reasonable care and prudence would dictate the necessity of placing on the bow of the barge an attentive lookout. The Lyndhurst (D. C.) 92 F. 681; Eastern Dredging Co. v. Winnisimmet Co. (C. C. A.) 162 F. 860; British Columbia Mills Tug & Barge Co. v. Mylroie, 259 U. S. 1, 42 S. Ct. 430, 66 L. Ed. 807.

It is my opinion that, if he had stationed such a lookout, the disaster would have been averted because the lookout would have been some 90 feet forward of the wheelhouse on the tug and nearer the water, and would have picked up the buoy sometime before the barge came abreast of it and in ample time to have enabled a reasonably skillful navigator to keep off of the shoals of the easterly bank.

His failure to take this ordinary precaution, in my opinion, was one of the principal causes contributing to the stranding, and, for this failure to take the usual and reasonable precaution, no adequate explanation is forthcoming. The defense of inevitable accident, therefore, cannot avail the tug. The Osceola (D. C.) 18 F.(2d) 415; The Mabey, 14 Wall. 204, 20 L. Ed. 881.

As to the liability of the Cyanamid Company, impleaded on the petition of the claimant, the evidence does not disclose that the company had knowledge that the vapors coming from its plant constituted a menace to navigation. Nor does the evidence warrant a finding that the company, in its method of drying fertilizer, was guilty of any negligent act or omission.

I am unable to see how it violated any duty which it owed the owners of the tug. It is unnecessary, however, to inquire further into this matter because of my conclusion that the smoke emanating from the factory of the Cyanamid Company was not the proximate cause of the damages done to the barge and cargo.

In conclusion, therefore, I find that the Perth Amboy is liable to the Rockland Transportation Company for damages done to the barge, and to the International Minerals & Metals Corporation for damage done to the cargo.

Decrees for the libelants in both cases may be entered, and the cases referred for assessment of damages.